# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

Members of the Board of
Administration of the Toledo Area
UAW Retirement Income Plan,

        Plaintiff,

    v.

OBZ, Inc., *et al.*,

        Defendants.

Case No. 3:15CV00756

**ORDER**

    This is an ERISA pension withdrawal liability case in which plaintiff, Members of the Board of Administration of the Toledo Area UAW Retirement Income Plan, claims defendant, RAKA Corp. (d/b/a Lockrey Manufacturing) (Lockrey), remains liable for defendant OBZ, Inc.'s (f/k/a Toledo Wire Products Inc.) (Toledo Wire) withdrawal liability under the Employee Retirement Income Security Act (ERISA) and the Multiemployer Pension Plan Amendments Act (MPPAA).

    Jurisdiction exists under 28 U.S.C. § 1331.

    Pending is defendant Lockrey's motion to dismiss for failure to state a claim. (Doc. 34). Plaintiff has filed a response (Doc. 37) to which defendant Lockrey has replied. (Doc. 38).

    For the following reasons, I deny the motion.

**Background**

In September, 2014, Lockrey, a Toledo-based company, entered into an asset purchase agreement with Toledo Wire, another Toledo-based company engaged in the wire-forming business. The purpose of the sale was for Lockrey to become a wire-forming company. For $250,000 Lockrey purchased a portion of Toledo Wire's assets and its customer list.

Unlike Lockrey, a nonunion employer, Toledo Wire operated as a union company and participated in a multiemployer pension plan (the Plan) under a collective bargaining agreement (CBA) with The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America. For ERISA purposes, Toledo Wire was a "contributing employer" with respect to the Plan.

Pursuant to the CBA, Toledo Wire made monthly contributions to the Plan on behalf of its unionized workers until May, 2013. On that date, Toledo Wire ceased operations covered by the CBA. The result was a complete withdrawal from the Plan.

Toledo Wire remained liable, however, for withdrawal liability under the MPPAA, which plaintiff alleges Lockrey knew about before entering into the asset purchase agreement. In accordance with ERISA and the MPPAA, on October 17, 2013, the Plan informed Toledo Wire of its withdrawal liability, calculated at $644,311. In November, 2013, Toledo Wire made its first withdrawal liability payment to the Plan and continued to make such payments to the Plan until October, 2014.

As noted above, in September, 2014, Toledo Wire sold the majority of its assets to Lockrey. Although Lockrey continued to do the same type of work in the jurisdiction of the CBA for which contributions were previously required of Toledo Wire, Lockrey did not make any

contributions to the Plan or withdrawal liability payments following its purchase of Toledo Wire's assets.

According to plaintiff, Lockrey has since continued Toledo Wire's operations, thus operating as Toledo Wire's successor. This, plaintiff asserts, is evidenced by:

- The purpose of the sale was for Lockrey to enter the same type of business in which Toledo Wire previously engaged;

- Lockrey required Toledo Wire to change its name as a condition of sale;

- Lockrey held itself out as acquiring Toledo Wire to the public on its website;

- Lockrey acquired all of Toledo Wire's employees;

- Lockrey hired a former Toledo Wire employee who left Toledo Wire prior to the sale;

- Former Toledo Wire customers were notified of the sale and the effect that the sale would have on payments and invoices—namely, that future payments would be made to Lockrey;

- Lockrey retained over half of Toledo Wire's former customers until at least October, 2016; and

- Lockrey used all of Toledo Wire's assets after the sale and currently uses approximately fifty percent of those assets.

When Toledo Wire stopped making withdrawal liability payments to the Plan, the Plan advised Toledo Wire owners that Toledo Wire remained under the same legal obligation for withdrawal liability regardless of any change in ownership. Toledo Wire did not make any additional payments, and the withdrawal liability amount remains unsatisfied.

Due to Toledo Wire's failure to make withdrawal payments, on April 17, 2015, plaintiff filed suit against defendants Toledo Wire (referred to as OBZ, Inc. in plaintiff's initial complaint) and Ann Obertacz, part owner of OBZ, Inc., asserting claims of withdrawal liability pursuant to MPPAA and ERISA.

On April 14, 2017, plaintiff filed an amended complaint to join Lockrey as a new defendant under a theory of successor liability. Specifically, in Count Two, plaintiff asserts that Lockrey is liable for the $644,000 in withdrawal liability owed by Toledo Wire.

Defendant Lockrey now moves for dismissal of Count Two and dismissal as a party defendant.

**Standard of Review**

A complaint must contain a "short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the complaints allegations are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (internal citations omitted).

I must "construe the complaint in the light most favorable to the plaintiff." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). Plaintiff, however, must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly, supra*, 550 U.S. at 555.

In ruling on a motion to dismiss, I may consider "the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to

the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

## Discussion

### A. Withdrawal Liability Under the MPPAA[1]

"Congress enacted the MPPAA to protect the financial solvency of multiemployer pension plans." *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of California, Inc.*, 522 U.S. 192, 196 (1997); *see also Pension Benefit Guarantee Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722 (1984) (recognizing Congress' intent for MPPAA as reducing "the adverse consequences that resulted when individual employers terminate[d] their participation in, or withdr[e]w from, multiemployer plans").

MPPAA requires an employer withdrawing from a multi-employer fund to pay its share of "unfunded vested benefits." 29 U.S.C. § 1381(b)(1). An employer completely withdraws from a fund when it "permanently ceases to have an obligation to contribute under the plan" or "permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a).

---

[1] In the present action, the issue is not whether Toledo Wire was liable for withdrawal liability when it withdrew from the Plan. That fact was established by the fact that plaintiff calculated Toledo Wire's withdrawal liability, notified Toledo Wire, and demanded payment, which Toledo Wire accepted when it began making withdrawal liability payments. Instead, as discussed in the next section, my focus is on the application of federal common law successor liability to this case and whether Lockrey is liable for the previously established withdrawal liability of its predecessor—Toledo Wire. As such, I do not include a full and complete analysis of the specific MPPAA provisions outlining the procedures a plan sponsor must follow to calculate withdrawal liability and the procedures an employer must follow to object to that calculation.

## B. Successor Liability

Plaintiff alleges that Lockrey is a successor of Toledo Wire. In its motion to dismiss and reply brief, Lockrey largely ignored plaintiff's claim regarding Lockrey's alleged successor liability. Rather than explicitly disputing the successor allegation, Lockrey relied solely on the argument that because it is not and has never been a party to any CBA that created an obligation to contribute to the Plan, it is not an "employer" for purposes of ERISA and the MPPAA and, therefore, cannot be liable for Toledo Wire's withdrawal liability.

Defendant's argument, however, misses the mark. There is no dispute that Lockrey was not a signatory to the CBA governing the Plan and, thus, was not bound, at least initially, by the CBA. The issue here, however, is whether the doctrine of successor liability applies and renders Lockrey liable as a successor employer—not as an original party to the CBA with an obligation to contribute to the Plan—for the debt owed to plaintiff by Toledo Wire, its predecessor.

Most states adhere to the general rule of:

> nonliability for acquiring corporations, with the following exceptions: The purchaser may be liable where: (1) it assumes liability; (2) the transaction amounts to a consolidation or merger; (3) the transaction is fraudulent and intended to provide an escape from liability; or (4) the purchasing corporation is a mere continuation of the selling company.

*Bender v. Newell Window Furnishings, Inc.*, 681 F.3d 253, 259 (6th Cir. 2012); *see also Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 586 (6th Cir. 2006) ("[A] successor corporation generally is not liable for its predecessors liabilities unless expressly assumed.").

However, federal courts have created a federal common law successorship doctrine that imposes liability upon successors beyond the common law in an effort to protect important

employment law policies. *See Golden State Bottling Co. v. NLRB*, 414 U.S. 168 (1973) (analyzing successor liability in the context of labor obligations and acknowledging the need to "strik[e] a balance between the conflicting legitimate interests of the bona fide successor, the public, and the affected employee to effectuate national labor policy"); *see also Einhorn v. M.L. Ruberton Const. Co.*, 632 F.3d 89, 95 (3d Cir. 2011) (applying *Golden State Bottling Co., supra*, 414 U.S. 168, to the ERISA context because "the federal policies underlying ERISA and the [MPPAA] are no less important, and no less compel the imposition of successor liability than do the policies animated the NLRA, Title VII, or other statutes to which the doctrine has been extended") (internal citation and quotation marks omitted); *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1327 (7th Cir. 1990) ("[W]e do not see any reason why successor liability should not in principle apply to actions seeking recovery of delinquent multiemployer pension fund contributions.").

Under the federal common law standard, upon which plaintiff's argument as to Lockrey relies, "a purchaser of assets may be liable for delinquent ERISA fund contributions to vindicate important federal statutory policy where the buyer had [1] notice of the liability prior to the sale and [2] there exists sufficient evidence of continuity of operations between the buyer and seller." *Einhorn*, *supra* 632 F.3d at 99; *see also Upholsterers' Int'l Union Fund, supra,* 920 F.3d at 1329 (holding application of successor liability appropriate "in those cases where the vindication of an important federal statutory policy has necessitated the creation of an exception to the common law rule, where the successor has had prior notice of the liability in question, and where there has existed sufficient evidence of continuity of operations between the predecessor and successor").

As the Third Circuit noted, these elements exist to protect buyers entering into transactions without knowledge of a seller's liabilities to avoid discouraging corporate

7

transactions. *Einhorn, supra,* 632 F.3d at 96 ("The requirement of notice and the ability of the successor to shield itself during negotiations temper concerns that imposing successor liability might discourage corporate transactions."); *Upholsters' Int'l Union Pension Fund, supra,* 920 F.2d at 1327 ("[I]t would be inequitable to hold a successor liable when it was unable to take the liability into account in negotiating the acquisition price or when the predecessor was capable of paying and merely attempted to externalize the liability onto another party."); *Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841, 849 (7th Cir. 2015) ("The notice requirement is animated by concerns that it is inequitable to impose successor liability upon an innocent purchaser who did not have an opportunity to protect itself by obtaining indemnification or negotiating a lower purchase price.").

On the other hand, federal courts recognize that "[s]hielding a successor employer from liability when the company had knowledge of the potential liability and still had bargaining power with regard to the transaction runs counter to the policies underlying the doctrine of successor liability." *Tsareff*, *supra,* 794 F.3d at 849.

While this issue has not yet been addressed by the Sixth Circuit,[2] several federal courts in other jurisdictions have applied successor liability in the ERISA context where a party seeks to hold a successor liable for its predecessor's delinquent ERISA contributions or MPPAA withdrawal liability.[3]

---

[2] In *McCollum v. Life Ins. Co. of N. Am.*, 495 Fed. App'x 694, 706 n.12 (6th Cir. 2012), the Sixth Circuit had the opportunity to apply the successor liability analysis in an ERISA case but declined to do so because the plaintiff in that case "[did] not contend that successor liability in the ERISA context is different than common-law successor liability."

[3] *See, e.g., Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 308 (1st Cir. 1998) ("Although developed in the labor law context, alter ego or successor liability analysis has been applied to claims involving employee benefit funds brought under ERISA and the

LMRA."); *Stotter v. Div. of Graduate Plastics Co., Inc. v. Dist. 65, United Auto Workers,* 991 F.2d 997, 1002 (2d Cir. 1993) (holding arbitrator did not exceed his authority when finding a successor employer liable for delinquent contributions owed under the predecessor employer's CBA with a union); *Einhorn v. M.L. Ruberton Const. Co.*, 632 F.3d 89, 99 (3d Cir. 2011) (remanding for the district court to apply the successorship doctrine in ERISA case where employee benefit plans sued purchaser of employer's assets to recover unpaid contributions owed under collective bargaining agreements); *Tsareff v. Manweb Servs., Inc.*, 794 F.3d 841, 846 (7th Cir. 2015) (holding that notice of contingent withdrawal liability satisfies the successor liability notice requirement and a contrary holding would create a "loophole" foreclosing multiemployer plan sponsors "from seeking withdrawal liability from asset purchasers who would otherwise qualify as successors, and the plans would be left 'holding the bag'"); *Upholsterers' Int'l Union Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1328 (7th Cir. 1990) (holding that successor liability applies in the ERISA context and stating that the opposite conclusion "would be contrary to congressional pension policy"); *Haw. Carpenters Trust Funds v. Waiola Carpenter Shop, Inc.*, 823 F.2d 289 (9th Cir. 1987) (applying the substantial continuity test to determine whether a successor was liable for delinquent contributions following an asset purchase); *Resilient Floor Covering Pension Trust Fund Bd. of Trustees v. Michael's Floor Covering, Inc.,* 801 F.3d 1079, 1093 (9th Cir. 2015) ("We see no reason why the successorship doctrine should not apply to MPPAA withdrawal liability just as it does to the obligation to make delinquent ERISA contributions."); *Reed v. EnviroTech Remediation Servs., Inc.*, 834 F. Supp. 2d 902, 910 (D. Minn. 2011) ("Liability for delinquent employee benefit contributions may also attach to a successor corporation, under certain circumstances."); *Bd. of Trustees of Unite Here Local 25 v. MR Watergate LLC*, 677 F. Supp. 2d 229, 231 (D.D.C. 2010) (applying a nine-part test—reflecting the notice and continuity of operations elements—to determine whether purchaser of assets is a successor employer subject to withdrawal liability); *Trs. of the Utah Carpenters & Cement Masons Pension Trust v. Daw, Inc.*, 2009 WL 77856, *3 (D. Utah) (holding buyer liable for seller's withdrawal liability under ERISA); *see also* 14 Fletcher, Cyc. Corp. § 6755 ("Although asset sales do not ordinarily result in successor liability, federal courts in the labor law field have taken a far more liberal approach [than the common law] in imposing the obligations of a seller of assets on the purchaser. This approach has been followed to hold a successor liable where the predecessor employer had failed to meet its payment obligations under a multiemployer plan. . . . Withdrawal from a multiemployer plan can generate withdrawal liability for successor corporations.").

In addition to courts in other circuits, several district courts in the Sixth Circuit have applied successor liability in ERISA cases. *See, e.g., Sheet Metal, Air, Rail, & Transp. Workers No. 33 Youngstown Dist. Collection & Admin. Agency, Inc. v. Total Air Sys.*, 2014 WL 2772668 (N.D. Ohio) (considering plaintiff's claim to recover delinquent ERISA contributions under the federal common law successor liability standard but holding summary judgment proper due to the lack of evidence of continuity of operations); *Bd. of Trustees of Plumbers v. R. & T. Schneider Plumbing Co.*, 2015 WL 4191297 (S.D. Ohio) (recognizing, but declining to apply under the factual circumstances, successor liability as a theory of relief in ERISA case); *Schilling v. Interim Healthcare of Upper Ohio Valley, Inc.*, 2008 WL 2355831 (S.D. Ohio) (applying the two elements and finding successor liability proper where "business of [seller] and [buyer] is essentially the same, the former employees of [seller] are now employed by [buyer] doing the same jobs in the same working conditions, and [buyer] has the same . . . core customers as [seller]"); *Zawlocki v. Rama Tech LLC,* 2005 WL 3991756 (E.D. Mich.) (holding defendant was not liable under ERISA as a successor employer); *Bennett v. Gilbert*, 1998 WL 35434962, *2 (W.D. Mich.) (finding successor liability in the ERISA context promotes "Congressional intent to protect plan participants and their beneficiaries" and holding defendant liable for contributions unpaid by its predecessor where continuity of operations and knowledge of the liability were established).

I agree with those circuits, as well as the district courts in the Sixth Circuit, that have held federal common law successor liability applies to delinquent ERISA contribution claims. Further, I agree with those circuits that have held federal common law successor liability applies to claims brought by a multiemployer pension plan to recover withdrawal liability pursuant to the MPPAA. The justification for my conclusion is akin to the Ninth Circuit's analysis in *Resilient Floor*

*Covering Pension Trust Fund Bd. of Trustees v. Michael's Floor Covering, Inc.*, 801 F.3d 1079 (9th Cir. 2015). There, the court explicitly held a successor employer could be subject to MPPAA withdrawal liability:

> The primary reason for making a successor responsible for its predecessor's delinquent ERISA contributions is that, "[a]bsent the imposition of successor liability, present and future employer participants in the union pension plan will bear the burden of [the predecessor's] failure to pay its share," which will threaten the health of the plan while the successor reaps a windfall. *Artistic Furniture,* 920 F.3d at 1328. That rationale applies with equal, if not greater, force to a predecessor's MPPAA withdrawal liability. A primary purpose of ERISA is "to ensure that employees and their beneficiaries [a]re not . . . deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *R.A. Gray & Co.*, 467 U.S. at 722. The MPPAA's purpose is better to effectuate ERISA's purpose. By assessing proportional liability to individual employers who withdraw from a plan, the MPPAA avoids overburdening the remaining participating employers and increases the likelihood that multiemployer plans remain fully funded. *See id.* at 722-25.

*Id.* at 1093-94.

Thus, the question in the present case becomes whether the amended complaint is sufficient to state a claim of successor liability under the standard imposed by *Twombly* and *Iqbal*. Reading the amended complaint in the light most favorable to plaintiff, I conclude it does, in fact, do so.

The complaint alleges facts that arguably establish Lockrey's status as a successor employer. Plaintiff's allegations with respect to Lockrey's liability track the two elements required to establish a company's status as a successor employer under federal common law.

First, plaintiff's complaint includes allegations regarding Lockrey's notice of Toledo Wire's withdrawal liability. Plaintiff alleges, "Lockrey was on notice of the withdrawal liability of Toledo Wire prior to the Sale." (Amended Complaint, ¶104). Further, plaintiff alleges that "Prior to the Sale, Lockrey and/or its attorneys were provided with documentation that

11

demonstrated that Toledo Wire was subject to withdrawal liability [,and] Lockrey and/or its agents were aware of the fact that Toledo Wire was paying withdrawal liability." (*Id.* ¶¶48-49). And finally, plaintiff alleges, "The agreement for the Sale recognized that the Plant Closing Agreement between Toledo Wire and the United Auto Workers Union was provided to Lockrey prior to the sale"; "The Plant Closing Agreement references that it does not waive the withdrawal liability of Toledo Wire"; and "Lockrey was aware of Toledo Wire's withdrawal liability at the time of the Sale." (*Id.* ¶¶66-68).

Second, plaintiff's complaint includes allegations regarding the continuity of operations between Lockrey and Toledo Wire following the asset purchase. Plaintiff alleges, "There is sufficient evidence of continuity of operations between Toledo Wire and Lockrey before and after the Sale to warrant imposing withdrawal liability on Lockrey under the theory of successor liability applied to ERISA withdrawal cases under federal common law." (*Id.* ¶112).

Plaintiff goes on to include facts supporting the continuity of operations allegation. For example, plaintiff alleges that all Toledo Wire employees received jobs after the asset sale, and "that was part of the deal." (*Id.* ¶50). As part of the agreement, plaintiff alleges Lockrey required Toledo Wire to change its name, which it did, "so that Lockrey could pass themselves off as a successor to Toledo Wire and retain the customer base." (*Id.* ¶52). Plaintiff also alleges that Lockrey entered into the agreement with Toledo Wire for the sole purpose of becoming a wire-forming company—the same type of business Toledo Wire operated—and following the sale, Lockrey initially used all the equipment purchased from Toledo Wire and still uses about fifty percent of that equipment.

And plaintiff continues by alleging:

> Lockrey held itself out as acquiring Toledo Wire to the public on its website, not merely purchasing its assets . . . so that it could show the customers that there was substantial continuity in the operation of the Toledo Wire business before and after the Sale.
>
> All of the employees of Toledo Wire were acquired by Lockrey and worked for Lockrey after the Sale.
>
> Lockrey also employed a former Toledo Wire employee to help manage the manufacturing of the wire-forming products.
>
> Lockrey used most of the same equipment used by Toledo Wire in continuing the Toledo Wire-forming business.
>
> Products completed by Toledo Wire but shipped and invoiced after September 30, 2014 were to be made payable to Lockrey Manufacturing.
>
> There was substantial continuity of Toledo Wire customers before and after the Sale.

(*Id.* ¶¶105-11).

Taken together and accepted as true, these facts demonstrate "a claim to relief that is plausible on its face." *Iqbal, supra,* 556 U.S. at 678 (quoting *Twombly, supra,* 550 U.S. at 570). Specifically, the facts alleged in this case, if true, suffice to establish "notice of the liability prior to the sale" and "continuity of operations between the buyer and seller"—the two elements required to establish successor liability. *Einhorn*, *supra* 632 F.3d at 99. The pleading standard established in *Iqbal* and *Twombly* "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," but it "does not require 'detailed factual allegations.'" *Iqbal, supra,* 556 U.S. at 678 (quoting *Twombly, supra,* 550 U.S. at 555). Plaintiff's allegations—detailing Lockrey's notice of Toledo Wire's outstanding withdrawal liability prior to the sale and Lockrey's continuity of Toledo Wire operations after the sale—are more than sufficient to "nudge [plaintiff's] claims across the line from conceivable to plausible." *Twombly, supra,* 550 U.S. at 570.

Thus, I conclude it is appropriate for this case to proceed to discovery to further develop the facts necessary to determine whether Lockrey is, in fact, a successor employer under the federal common law doctrine of successor liability—specifically, Lockrey's notice and knowledge of Toledo Wire's benefits liabilities and the continuity of operations between the two companies.

Therefore, I deny defendant Lockrey's motion to dismiss.

**Conclusion**

Plaintiff's amended complaint includes factual allegations sufficient to state a plausible claim for successor liability against defendant Lockrey.

It is, therefore,

ORDERED THAT: defendant's motion to dismiss (Doc. 34) be, and the same hereby is, denied.

The Clerk shall forthwith schedule a status/scheduling conference.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge