Members of the Board of Administration                    Case No. 3:15CV756
 of the Toledo Area Industries UAW
 Retirement Income Plan,

          Plaintiff

      v.                                                                **ORDER**

OBZ, Inc., et al.,

          Defendants

      This is a withdrawal-liability case under the Employee Retirement Income Security Act

(ERISA), 29 U.S.C. § 1001, *et seq.*

      Toledo Wire was a wire-forming company that shuttered in September, 2013.

      A collective bargaining agreement with the union representing its workforce obligated

Toledo Wire to contribute to a multiemployer pension plan on behalf of the employees. Toledo

Wire made those contributions until May, 2013, when it withdrew from the plan. Five months

later, the plaintiff in this case, the Members of the Board of Administration of the Toledo Area

Industries UAW Retirement Income Plan (the Plan), notified Toledo Wire that it owed the

pension plan $644,311 in withdrawal liability.

      One of Toledo Wire's former customers, defendant RAKA Corporation (which does

business as Lockrey Manufacturing), purchased Toledo Wire's assets, in September, 2014, for

$250,000. It is undisputed that Toledo Wire's owners, defendants Ann and Ken Obertacz, never

disclosed the withdrawal liability to Lockrey's principals. But documents provided to Lockrey

showed that Toledo Wire's workforce was unionized, that Toledo Wire had made contributions to a union-sponsored pension plan, that the company had since withdrawn from the plan, and that the union was not "waiv[ing] . . . any withdrawal liability that may be determined and imposed [against Toledo Wire] in the future." (Doc. 80–1 at 3).

The Plan brought this suit in 2015 to recover the withdrawal liability from defendant OBZ, Inc., the insolvent successor to Toledo Wire, and Lockrey, on the theory that Lockrey is a successor employer and therefore responsible for the withdrawal liability. *See Pension Benefit Guar. Corp. v. Findlay Indus., Inc.*, 902 F.3d 597, 609–12 (6th Cir. 2018) (adopting the rule of successor liability). The Plan also sued the Obertaczes individually, alleging that they violated ERISA by transferring to themselves certain assets from Toledo Wire with a principal purpose of avoiding the withdrawal liability.

Pending are counter-motions for summary judgment on the question whether Lockrey is a successor employer. (Docs. 79, 80). Also pending is the Plan's partial motion for summary judgment against OBZ, Inc. on the withdrawal-liability claim and against the Obertaczes on the evasion-of-liability claim. (Doc. 81).

For the reasons that follow, I grant the Plan's motion against Lockrey in part and deny it in part, deny Lockrey's motion, and grant the Plan's motion.

## Background

Toledo Wire employees belonged to the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW). A collective bargaining agreement required Toledo Wire to fund its share of a multiemployer pension plan known as the Toledo Industries UAW Retirement Income Plan.

## A. Toledo Wire's Withdrawal Liability

In September, 2013, after the Obertaczes determined that Toledo Wire could not stay in business, the company executed a Plant Closing Agreement with the UAW. (Doc. 80–1).

Under the section header "**Retirement Income Benefits**," the agreement provided that Toledo Wire's obligation to contribute to the plan "ceased, once and for all, as [of] May 31, 2013." (*Id.* at 3) (bold in original). It stated that "nothing in this Plant Closing Agreement shall be considered or asserted to be a waiver of any withdrawal liability that may be determined and imposed in the future by the . . . Plan." (*Id.*).

The plan was underfunded when Toledo Wire withdrew. ERISA provides that an employer who withdraws from a plan in such circumstances remains liable for its share of unfunded vested benefits. 29 U.S.C. § 1381(b)(1). Accordingly, in October, 2013, the Plan notified the company that it owed $644,311 in withdrawal liability. Toledo Wire did not contest that assessment and continued to make monthly withdrawal-liability payments until October, 2014, shortly after the sale to Lockrey.

## B. Asset Sale

Lockrey, a machining and fabricating company located in Toledo, had purchased wire components from Toledo Wire and used them to make products for its own customers.

Soon after its withdrawal from the Plan, Toledo Wire had problems filling Lockrey's orders. A Lockrey executive, Dirk Ward, learned that another company, NSS Enterprises, encountered similar problems obtaining product from Toledo Wire. In August, 2014, Ward testified, Lockrey began exploring the possibility of purchasing Toledo Wire's business. According to Ward, doing so would enable Lockrey to "make product that we would buy in-

house and then we could also make product for NSS, which was already an existing customer" of Lockrey. (Doc. 77 at 19–20).

Lockrey's then-President, Don Vollmar, negotiated the sale with Ken Obertacz. He testified that he was unfamiliar with the concept of withdrawal liability and that neither of the Obertaczes told him of Toledo Wire's debt to the Plan. The Obertaczes likewise testified that they did not discuss withdrawal liability with Vollmar.

Lockrey and Toledo Wire executed an Asset Purchase Agreement on September 30, 2014. (Doc. 29–1). In exchange for $250,000, Lockrey received twenty-six pieces of machinery (such as presses, press brakes, benders, and welders), Toledo Wire's customer list, and its goodwill. (*Id.* at 3, 21–22). The parties valued the equipment at $120,000, Toledo Wire's "Goodwill and Customer List" at $120,000, and the assets of a separate limited liability company that the Obertaczes controlled, TW Products, LLC, at $10,000. (*Id.* at 3).

Lockrey did not buy Toledo Wire's corporate entity, but it insisted, on the advice of counsel, that Toledo Wire "change its corporate name to a name that is not similar to Toledo Wire and that is approved by [Lockrey]." (*Id.* at 9; Doc. 70 at 14). Toledo Wire eventually changed its name to OBZ, Inc.

Section 8(j) of the Asset Purchase Agreement contained the parties' representations concerning "**Labor Matters**." (Doc. 29–1 at 5) (bold in original).

There Toledo Wire represented that it was a party to a collective bargaining agreement with the UAW, and that "a copy of [the collective bargaining agreement] has been provided to" Lockrey. (*Id.*). Toledo Wire also represented that it "has provided [Lockrey] with a copy of the Plant Closing Agreement between [it] and the United Auto Workers." (*Id.*).

Attorneys from the law firm Shumaker, Loop & Kendrick represented Lockrey during the transaction and drafted the Asset Purchase Agreement. (Doc. 70 at 11–12).

The lead attorney handling the matter, Michael McGowan, was a member of the firm's corporate transactions practice group. (*Id.* at 6). McGowan had only a general understanding of withdrawal liability and believed it was a concern "only in limited cases." (*Id.* at 9–10). He testified that if he saw "[s]omething that would suggest withdrawal liability" was an issue, he "would follow up on it," usually by consulting an attorney in the firm who handled ERISA matters. (*Id.* at 10).

Despite the Asset Purchase Agreement's representation that Toledo Wire had provided a copy of the collective bargaining agreement to Lockrey, McGowan testified that he did not recall reading it and that no such document was in his file. (*Id.* at 14). McGowan did receive a copy of the Plant Closing Agreement, however, from Toledo Wire's attorney, Steve Keller, and testified that he read it. (*Id.* at 16).

Asked for his understanding of the paragraph stating that the Plan was not waiving its right to collect any withdrawal liability imposed on Toledo Wire, McGowan testified that:

> A:  Well, since we were just buying selected assets and we weren't buying the entity, my analysis at that time, there was no basis for our client . . . to be liable for any withdrawal liability, so this was retained liability just like everything else we identified and left behind.

(*Id.* at 17).

McGowan added that he "probably" consulted with Timothy McCarthy, one of his firm's ERISA attorneys, about the withdrawal-liability issue. (*Id.* at 18). According to McGowan, McCarthy told him that withdrawal liability was not a concern. This was so, McCarthy told McGowan, because the only issue:

A:      . . . is whether our transaction could create a situation where there would be an obligation to negotiate with the union, and that was all.

And given this agreement and the fact that representations . . . that, you know, the union had essentially said for the true employees that were there, they just weren't concerned about this anymore, that we didn't feel there was any risk of that and it was minimal to the extent it was there, so we proceeded forward.

Q:      Did you talk about withdrawal liability, whether that could come on Lockrey?

A:      I don't recall any in-depth discussion of that. I don't think we considered it to be an issue at all.

Q:      Did you discuss that with Keller?

A:      Not that I recall.

Q:      Did you ask to view their withdrawal liability as part of that?

A:      No.

(*Id.* at 18–19).

### C. Lockrey's Operations After the Sale

### 1. Toledo Wire Employees Go to Work at Lockrey

After the sale, Lockrey offered jobs to "all the employees" of Toledo Wire: Dennis Jeko, Jackie Lutman, Lemon Holman, and William Russell. (Doc. 77 at 57). Lockrey also hired a former Toledo Wire employee, Eric Fodor, "to help manage the transition of the wire form" because Lockrey "didn't know what we were doing with wire forming." (*Id.* at 33). Fodor had been a long-time Toledo Wire plant manager, but had left the company sometime in 2013.

Lutman worked for Lockrey as a customer-service representative until the end of 2014, and Lockrey fired Russell shortly after he started working there. But Jeko, Holman, and Fodor were working in the company's wire-forming division through December, 2017. (Doc. 66 at 95–96).

Each employee except Russell (who apparently was not deposed) testified that he or she performed similar or essentially the same work at Lockrey as he or she had done at Toledo Wire. (Doc. 66 at 13, 82–83) (Fodor) (similar duties, though he was not a manager at Lockrey); (Doc. 68 at 17) (Jeko did "some of the same things," in addition to new duties); (Doc. 71 at 10, 12–13) (Holman's testimony that "[i]t's a little different but it basically all blend in together [*sic*]"); (Doc. 78 at 10) (Lutman) (same customer-service duties).

Ward, who succeeded Vollmar as Lockrey's President, testified that the former Toledo Wire employees needed to be "train[ed] . . . to our quality standards . . . what our operational system is, our quality policy[.]" (Doc. 77 at 58–59). In particular, Ward testified, the former Toledo Wire employees did not how to read prints or make product from a print. (*Id.* at 59).

Holman explained how his job duties changed about a year after the asset sale.

According to Holman, the employees at Toledo Wire "were basically doing everything by hand." (Doc. 71 at 13). During his first year at Lockrey, Holman's work "was similar [to] what [he] did" at Toledo Wire. (*Id.* at 14). In late 2015, however, Lockrey purchased a new machine that "can do everything at one time," meaning that the "[o]nly thing [Holman had] to do is weld it together." (*Id.* at 13). The new machine effectively "upgrade[d] everything and made the job a lot faster." (*Id.* at 14).

Due to changes of this sort, Ward testified, Lockrey was able to "take a non-profitable product" that Toledo Wire had previously made "and actually make it profitable by doing it internally." (Doc. 77 at 38).

## 2. Lockrey Solicits Toledo Wire's Customers

By mid-October, 2014, Lockrey had installed Toledo Wire's assets in its plant, had them "running," and was "starting to ship product." (Doc. 80–2 at 1). Vollmar wrote in an email to all

"Lockrey Stations" that "[w]e look forward to an influx of new customers for all of our divisions." (*Id.*). Lockrey's website announced that it had "recently acquired a wire-forming company and the machines are up and running in our facility." (Doc. 80–4 at 1). Pictures that accompanied the announcement showed wire products that Toledo Wire made. (Doc. 67 at 30).

Ward himself reached out to at least three of Toledo Wire's former customers, letting them know "we purchased Toledo Wire Products," "the level of service will stay the same," and "you're not going to have a lag between getting your product, receiving your product." (Doc. 77 at 46–47, 48).

Lutman reached out to former Toledo Wire customers to "drum up business" for Lockrey and "let them know . . . it was still the same people doing the work." (Doc. 78 at 12–13).

Ann Obertacz conducted her own outreach campaign, explaining to her former customers that Lockrey was "committed to giving all of you a smooth transition" and assuring them that "[a]ll of your parts will continue to be produced on the same machinery by the same people." (Doc. 80–3 at 1).

At the same time, it is undisputed that Lockrey did not use Toledo Wire's trade name, designs, or trade secrets. (Doc. 79–1 at ¶¶11–12).

According to Ward, moreover, "Lockrey had no interest in taking business advantage of Toledo Wire's name and business reputation because by 2014 that reputation was tarnished by slow delivery of products and the need for it to pay cash to its supplier for raw materials." (*Id.* at ¶15). Ward did not try to square that claim with Lockrey's having paid $120,000 for Toledo Wire's customer list and goodwill.

### 3. Lockrey Does Business With Toledo Wire Customers

Ward could not recall whether Lockrey completed any orders that a customer had originally placed with Toledo Wire. (Doc. 77 at 49). Jeko and Holman, however, denied that Lockrey completed any such orders. (Doc. 68 at 19; Doc. 71 at 15).

Ward acknowledged, however, that acquiring wire-forming capacity allowed Lockrey to make new wire products for some of its existing customers. (*Id.* at 49–50; Doc. 66 at 98).

Lockrey's answers to the Plan's interrogatories establish, moreover, that, as of December, 2017, Lockrey's wire-forming unit had served thirty-six customers. (Doc. 80–5 at 8–9). Thirty-three of those customers had been customers of Toledo Wire before the sale, and twenty-eight of those thirty-three customers had never been customers of Lockrey. (*Id.*).

In 2014, Toledo Wire had served thirty customers that were not also Lockrey customers. (Doc. 66 at 97–98). After the asset sale, Lockrey filled orders for twenty-two of those customers, or 73.3% of Toledo Wire's customer base, in 2014. (*Id.*). Eleven of Toledo Wire's customers that did not purchase any product from the company in 2014 have since become Lockrey customers. (Doc. 80 at 8) (citing Doc. 66 at 97–98)).

Fodor estimated that 90% of Lockrey's wire-product output was "the same as what was being produced by" Toledo Wire. (Doc. 66 at 21). Fodor also testified that Lockrey continued to use at least twenty pieces of wire-forming equipment that it had purchased from Toledo Wire. (*Id.* at 31–42).

### D. The Obertaczes' Handling of Toledo Wire Assets

After the sale, OBZ, Inc. sold Toledo Wire's remaining equipment and scrap metal for $45,000. (Doc. 81–2 at 3). It also listed the company's building for sale. (Doc. 64 at 44).

Ann and Ken admitted that they received $21,000 of the proceeds of the Lockrey sale and about $24,000 from the sale of Toledo Wire's scrap. (Doc. 33 at ¶81). They used this money for their general living expenses and to buy a pontoon boat and golf cart. (Doc. 64 at 68). The Obertaczes also transferred two Toledo Wire vehicles to themselves, without any consideration to Toledo Wire, for their personal use. (Doc. 33 at ¶8).

In May, 2015, after Toledo Wire had defaulted on its withdrawal-liability payments, the Obertaczes took out a $50,000 loan, secured by the Toledo Wire building and the Obertaczes' 401(k) accounts. They used the proceeds to help pay for a house they were building at the time.

## Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where, as here, parties have filed cross-motions for summary judgment, the Court grants or denies each motion for summary judgment on its own merit, applying the standards described in Fed. R. Civ. P. 56." *Clarendon Nat'l Ins. Co. v. Lexington Ins. Co.*, 312 F. Supp. 3d 639, 646 (N.D. Ohio 2018) (Carr, J.) (internal quotation marks omitted).

## Discussion

### A. Successor Liability

"Multiemployer pension plans are based on defined contributions and pay defined benefits. If one employer defaults on its contributions, whether by delinquency or withdrawal, other employers must make up the difference to cover the defined benefits owed to participants." *Indiana Elec. Workers Pension Benefit Fund v. ManWeb Servs., Inc.*, 884 F.3d 770, 775 (7th Cir. 2018). "Unpaid contributions also result in the loss of investment income that could have been earned by the plan." *Id.*

"Both types of losses put financial pressure on the remaining employers and discourage new employers from joining." *Id.* "The financial stability of the plan is put in jeopardy, and plan beneficiaries risk losing their pension plans." *Id.*

Congress amended ERISA, by way of the Multiemployer Pension Protection Amendments Act of 1980 (MPPAA), "to protect multiemployer plans from these damaging consequences of withdrawal." *Id.* The amendments "make employers liable for unfunded vested benefits if they withdraw from a multiemployer plan." *Resilient Floor Covering Pension Trust Fund Bd. of Trustees v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1089 (9th Cir. 2015) (citing 29 U.S.C. § 1381).

It is undisputed that Toledo Wire was liable for $644,311 in withdrawal liability owed to the Plan.[1] But the parties dispute whether Lockrey is also liable for that sum under the federal common law of successor liability.

Under traditional common law, "a successor corporation generally is not liable for its predecessor's liability unless expressly assumed." *Members of Bd. of Admin. of Toledo Area UAW Ret. Income Plan v. OBZ, Inc.*, 2017 WL 4759031, *3 (N.D. Ohio 2017) (Carr, J.). For that reason, asset purchase agreements – including the one the parties executed here (Doc. 29–1 at 3) – "typically provide that the buyer acquires the assets of the selling company but does not assume the seller's liabilities." *ManWeb*, *supra*, 884 F.3d at 776.

But this rule is not absolute.

In the context of "federal labor and employment law," *Findlay Indus.*, *supra*, 902 F.3d at 611, courts have developed a rule of successor liability under which certain of a seller's

---

[1] OBZ, Inc. does not dispute that it is responsible for the withdrawal liability and did not respond to the Plan's motion for summary judgment. I will therefore grant the Plan's motion against OBZ, Inc. on its withdrawal-liability claim.

liabilities may transfer to the purchaser if the purchaser "substantially assumes a predecessor's assets, continues the predecessor's operations without interruption or substantial change, and has notice [of the liability] at the time of acquisition." *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1325 (7th Cir. 1990).

As I explained in my order denying Lockrey's motion to dismiss, federal courts across the country have applied the successor-liability rule in ERISA cases involving a predecessor's delinquent contributions to a multiemployer plan as well as its withdrawal liability. *OBZ, Inc.*, *supra*, 2017 WL 4759031 at *3–5. In *Findlay Industries*, *supra*, 902 F.3d at 611, the Sixth Circuit adopted "the federal common law of successor liability" in a case under the MPPAA.[2]

Under that rule, an asset purchaser may be liable for a seller's ERISA withdrawal liability if the purchaser "had notice of the liability prior to the sale and there exists sufficient continuity of operations between the buyer and seller." *Einhorn v. M.K. Ruberton Const. Co.*, 632 F.3d 89, 99 (3d Cir. 2011); *see also Resilient Floor*, *supra*, 801 F.3d at 1093 (successorship doctrine applies equally to "MPPAA withdrawal liability just as it does to the obligation to make delinquent ERISA payments").

"[S]uccessor liability is an equitable doctrine, not an inflexible command, and in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts

---

[2] Smuggled inside Lockrey's summary-judgment motion is, in effect, a motion to reconsider my prior ruling that the law of successor liability applies to withdrawal-liability cases. (Doc. 79 at 6–12). I deny that request for two reasons. First, Lockrey's arguments are untimely. The company "largely ignored" this issue when it briefed its motion to dismiss, despite the Plan's invocation of the successor-liability rule. *OBZ, Inc.*, *supra*, 2017 WL 4759031 at *3. Reconsidering that issue now, after I denied the motion to dismiss and permitted substantial discovery on the successorship issue, is not appropriate. Second, Lockrey's arguments are untenable in light of *Findlay Industries*, *supra,* decided after Lockrey moved for summary judgment but not discussed in either its reply brief in support of that motion or its opposition to the Plan's motion for summary judgment. (Docs. 83, 85).

in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate." *Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841, 848 (7th Cir. 2015).

### 1. Notice of the Withdrawal Liability

It is undisputed that the Obertaczes did not disclose Toledo Wire's withdrawal liability to Lockrey's principals or attorneys. It is also undisputed that neither Vollmar, Ward, or McGowan discovered the outstanding liability, even though the Plan had assessed it nearly a year before the sale.

However, the Plan argues that Lockrey had constructive notice of the liability – *i.e.*, that notwithstanding its actual ignorance of the withdrawal liability, Lockrey should have discovered that obligation. This is so, the Plan maintains, because Lockrey's attorney admitted that he possessed and reviewed a copy of the Plant Closing Agreement, which stated that neither the union nor Toledo Wire was "waiv[ing] . . . any withdrawal liability that may be determined and imposed [against Toledo Wire] in the future." (Doc. 80–1 at 3).

The Plan also emphasizes that Lockrey's counsel, on seeing the mention of withdrawal liability in the Plant Closing Agreement, consulted with an attorney in his firm who specialized in ERISA law. Finally, the Plan points out that Lockrey knew Toledo Wire's work force was unionized and that Toledo Wire had contributed to, and ultimately withdrawn from, a multiemployer pension plan.

To support these arguments, the Plan relies on *Heavenly Hana LLC v. Hotel Union & Hotel Industry of Hawaii*, 891 F.3d 839, 842 (9th Cir. 2018), where the court held that a purchaser must assume the withdrawal liability of its predecessor "if it was on constructive notice of potential withdrawal liability."

Lockrey urges me to reject *Heavenly Hana*, which, it claims, "would impose strict (withdrawal) liability" on any asset purchaser. (Doc. 83 at 7). According to Lockrey, only actual notice of the liability is sufficient to impose liability. (*Id.* at 8). The company also argues that *Heavenly Hana* is distinguishable on its facts.

While that latter assertion may be accurate, the distinction is not, as I explain below, material to my decision. Even viewing the evidence here in the light most favorable to Lockrey, a reasonable fact-finder could conclude only that "a purchaser [in Lockrey's shoes] using reasonable care or diligence would have discovered [Toledo Wire's] withdrawal liability." *Heavenly Hana*, *supra*, 891 F.3d at 847.

### a. Lockrey Had Constructive Notice

Most importantly, Lockrey's attorney had a document – the Plant Closing Agreement – that established: 1) Toledo Wire had made contributions to the Plan; 2) Toledo Wire withdrew from the plan nearly eighteen months before the sale; and 3) the Plan had not waived – and was thus maintaining its right to collect – "any withdrawal liability that may be determined and imposed in the future" by the Plan. (Doc. 80–1 at 3).

Faced with this evidence relating to potential withdrawal liability, a reasonable purchaser would take additional steps to determine, if it did not already know, what withdrawal liability was and the extent of any such liability.

And attorney McGowan seems to have done exactly that. Having only a general understanding of the concept, he undertook to learn from a specialist whether withdrawal liability was a salient issue for Lockrey. That he did so tends to confirm that a reasonable purchaser would, and Lockrey in fact did, try to determine whether Toledo Wire had any

withdrawal liability. That McGowan's colleague may have given him incomplete, inaccurate, or incorrect advice does not mean the company lacked constructive notice.

To be sure, as Lockrey argues, the evidence supporting the court's constructive-notice finding in *Heavenly Hana* was stronger than the evidence here.

Unlike Lockrey, the purchaser in *Heavenly Hana* "previously operated a hotel that participated in a multiemployer pension plan, and, in prior acquisitions involving multiemployer pension plans, [the purchaser] had required its agents to determine whether it could incur withdrawal liability from the transactions." *Heavenly Hana*, *supra*, 891 F.3d at 847.

But the purchaser in *Heavenly Hana* was not in an entirely different position than Lockrey. Rather, it, like Lockrey, had documentation establishing that "the employees at [the predecessor] were unionized and that [the purchaser] had contributed to a multiemployer pension plan." *Id.* While Lockrey lacked prior experience with multiemployer plans and familiarity with withdrawal liability, its attorney undertook to discover what withdrawal liability was and at least considered whether it could transfer to Lockrey.

This evidence permits only one reasonable conclusion: Lockrey had constructive notice of Toledo Wire's withdrawal liability.

### b. Constructive Notice Is Sufficient

The critical question, then, is whether constructive notice of Toledo Wire's withdrawal liability suffices to impose successor liability on Lockrey.

In *Heavenly Hana*, *supra*, 891 F.3d at 845, the Ninth Circuit found that "[a] constructive notice requirement is consistent with the MPPAA's purpose and liberal construction." *Heavenly Hana*, *supra*, 891 F.3d at 845.

The court explained that "Congress passed the MPPAA to protect plans from the adverse consequences that resulted when individual employers terminated their participation in, or withdrew from, multiemployer plans." *Id.* (internal brackets and quotation marks omitted). Chief among those consequences were "a significant decline in the number of contributors and . . . problems posed by employers withdrawing from multiemployer pension plans." *Id.* (internal citations omitted). The Ninth Circuit also observed that a "significant number of multiemployer pension plans were experiencing significant financial hardship." *Id.*

For these reasons, "courts have indicated that because ERISA (and the MPPAA) are remedial statutes, they should be liberally construed in favor of protecting the participants in employee benefit plans." *Id.* (internal quotation marks omitted).

The Ninth Circuit recognized, moreover, that its constructive-notice framework was "not an unfamiliar standard in the employment and labor context." *Id.* Rather, the Ninth Circuit, and other circuit courts, had adopted a constructive-notice standard in other contexts, including withdrawal-liability under ERISA's controlled-group provision and employment-discrimination claims. *Id.* at 845–46.

Finally, the Ninth Circuit concluded that "[a] constructive notice standard fairly balances the national policies underlying the statute at issue and the interests of the affected parties." *Id.* at 846 (internal quotation marks omitted). As the court explained, that standard placed only a minimal burden on the party in the best position to ensure that withdrawal liability was accounted for during an asset sale:

> Requiring purchasers to make reasonable inquiries into the existence of withdrawal liability advances the congressional interest in preventing underfunding in multiemployer pension plans. Imposing this burden would also have little negative impact on the fluid transfer of corporate assets. Purchasers would simply investigate the possible liability and negotiate a purchase price, an indemnity provision, or a security bond that would take it into account . . .

In short, put on constructive notice, purchasers can account for withdrawal liability in an asset purchase. Indeed . . . of the three relevant parties to successor withdrawal liability – the seller, the purchaser, and the pension plan – purchasers are in the best position to ensure withdrawal liability is accounted for during an asset sale. Sellers have no incentive to disclose potential liabilities because such liabilities are likely to drive the sale price in one direction only: down. Pension plans cannot be asked to investigate sales rumors, track down the identity of all potential purchasers, avoid confidentiality or contract interference concerns, and send notice of its (publicly-available) funding status directly to potential purchasers . . . Purchasers, in contrast, have the incentive to inquire about potential withdrawal liability in order to avoid unexpected post-transaction liabilities.

*Id.* at 846–47.

I find *Heavenly Hana* to be compelling authority and adopt its constructive-notice standard. Particularly persuasive, in my view, are: 1) the court's explanation that an asset purchaser is generally in the best position to account for potential withdrawal liability during an asset sale; and 2) its conclusion that placing a minimal burden on the purchaser best serves the overriding goals of ERISA and the MPPAA: protecting the participants of employee benefit plans.

The facts of this case, moreover, tend to show that the Ninth Circuit's approach was a reasonable one.

Here, as *Heavenly Hana* predicted might occur in similar situations, the Obertaczes failed to disclose to Lockrey Toledo Wire's withdrawal liability to the Plan (as doing so surely would have tanked the sale). There is no evidence, moreover, that the Plan was aware of the pending transaction or that it had an opportunity to notify Lockrey of the liability.[3] Lockrey, however,

_____

[3] In *Heavenly Hana*, *supra*, 891 F.3d at 847, the pension plan's funding notices were available on the Internet. The parties do not discuss whether this was the case with the Plan's funding notices.

had the incentive to protect itself against the imposition of withdrawal liability. Indeed, Lockrey made an attempt to protect itself against other forms of liability by imposing in the purchase agreement an obligation on Toledo Wire and the Obertaczes to indemnify it against "[a]ny liability or claims arising as a result of [Lockrey] being the transferee of the assets of" Toledo Wire. (Doc. 29–1 at 7).

Finally, I reject Lockrey's contention that a rule of constructive notice amounts to a rule of "strict liability" under which essentially all asset purchasers will acquire the predecessor's withdrawal liability.

For one thing, this argument ignores that there is no successor liability unless the purchaser also substantially continues the seller's business, an issue I take up below.

For another, a purchaser is on constructive notice only if "using *reasonable care or diligence*" would have led it to discover the withdrawal liability. *Heavenly Hana*, *supra*, 891 F.3d at 847 (emphasis supplied). Thus, even under *Heavenly Hana*, a purchaser that knows, for example, only that the seller was a party to a collective bargaining agreement is not on constructive notice of the seller's undisclosed withdrawal liability. *NW Admins, Inc. v. Santa Clarita Convalescent Corp.*, 2018 WL 5886454, *2 (W.D. Wash. 2018) (applying *Heavenly Hana* and rejecting successor-liability claim).

Here, the record shows conclusively that, had Lockrey's counsel exercised reasonable care and diligence, he – and thus Lockrey – would have known about the withdrawal liability.

Even aside from what the lawyer should have discovered based on what he had before him, the kind of reasonable care and diligence that an asset purchaser might generally be expected to undertake turned up substantial evidence in this case of Toledo Wire's possible withdrawal liability.

Lockrey was then in a position not only to have its attorney consult with another lawyer specializing in ERISA law, but also to "take[ ] additional actions to determine if withdrawal liability existed." *Heavenly Hana*, *supra*, 891 F.3d at 847. Lockrey might have, for example, 1) asked the Obertaczes if withdrawal liability existed; 2) asked the Obertaczes to provide documentation from the Plan concerning withdrawal liability; or 3) required the Obertaczes "to obtain an estimate of its [already-determined] withdrawal liability." *Tsareff*, *supra*, 794 F.3d at 849 (citing 29 U.S.C. § 1021(1)). These inquiries are simply not beyond the pale of what a reasonably diligent lay purchaser of a failing unionized enterprise's assets should normally be asking.

For all these reasons, I conclude that a reasonable fact-finder could only conclude that Lockrey was on constructive notice of Toledo Wire's withdrawal liability.

## 2. Substantial Continuity

"The primary question in labor and employment successorship cases is whether, under the totality of the circumstances, there is substantial continuity between the old and new enterprise." *Resilient Floor*, *supra*, 801 F.3d at 1090 (internal brackets and quotation marks omitted).

"[T]o determine continuity of operations, the courts look to: continuity of workforce; management; equipment and location; completion of work orders begun by the predecessor; and constancy of customers." *Sheet Metal, Air, Rail, & Transp. Workers No. 33 Youngstown Dist. Collection & Admin. Agency, Inc. v. Total Air Sys., Inc.*, 2014 WL 2772668, *8 (N.D. Ohio 2014) (Lioi, J.).

Based on the totality of the circumstances, the court determines whether the purchaser "has acquired substantial assets of its predecessor and continued, without interruption or

substantial change, the predecessor's business operations." *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987)

"Because the origins of successor liability are equitable, fairness is a prime consideration in its application." *Resilient Floor*, *supra*, 801 F.3d at 1091.

The parties in this case discuss at least nine factors: 1) whether the former Toledo Wire employees did the same jobs at Lockrey; 2) whether any Toledo Wire employees "managed" Lockrey's wire-forming operations; 3) whether Lockrey produces the same products that Toledo Wire formerly produced; 4) the extent to which Lockrey used Toledo Wire's equipment to make wire products; 5) whether Lockrey's manufacturing process is the same as, or similar to, Toledo Wire's process; 6) the former Toledo Wire employees' working conditions; 7) the extent to which Lockrey held itself out as continuing Toledo Wire's business; 8) the number of Toledo Wire customers that Lockrey now serves; and 9) how much of Lockrey's revenues come from its wire-forming business as a whole and from Toledo Wire's former customers in particular. (Doc. 79 at 19–24; Doc. 80 at 13–18; Doc. 82 at 14–19; Doc. 83 at 11–15).

Furthermore, each side argues that the undisputed evidence pertaining to these factors permits only a finding in its favor.

Having considered the parties' arguments and the evidence, I conclude that I cannot resolve the substantial-continuity issue on summary judgment.

To begin, the issue requires me to balance and, quite candidly, unavoidably to weigh the importance of a multiplicity of factors. Where the outcome thus depends on "a set of factors to be considered and balanced," there generally is a "need for a trial," provided that there are at least two reasonable views of the evidence. *Cuff v. Trans States Holdings, Inc.*, 768 F.3d 605,

609 (7th Cir. 2014); *see also Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018) ("weighing of the evidence" is "improper" on summary judgment).

And that is the case here. Depending on how one views and weighs the evidence, one might reasonably conclude that Lockrey did or did not substantially continue Toledo Wire's business.

Perhaps most importantly, Lockrey hired all of Toledo Wire's employees, in addition to a former Toledo Wire plant manager whom Lockrey brought on specifically to get the wire-forming operation off the ground. Lockrey used Toledo Wire's equipment to start forming wire, and Lockrey repeatedly reached out to former Toledo Wire customers, whether to solicit their business or allay any concerns about Lockrey's competence in the wire-forming business. Thereafter, a very large number of those customers became Lockrey customers.

At the same time, it is undisputed that Lockrey made a number of seemingly important changes after the asset sale. For one thing, it upgraded, as Toledo Wire had (or could) not, its wire-forming equipment. As a result, machine fabrication largely, if not entirely, replaced the kind of hand manufacture that Toledo Wire employed. This allowed Lockrey's operations to be more efficient, or so its principals testified. None of the former Toledo Wire employees managed operations at Lockrey, and their day-to-day job duties changed to some, and perhaps to a significant, degree.

It is also possible to draw conflicting inferences from the evidence regarding Lockrey's use, or in some cases non-use, of Toledo Wire's intangible assets.

Ward testified that Lockrey had no intention to capitalize on Toledo Wire's goodwill because none existed in 2014. Yet Lockrey paid $120,000 – 48% of the total purchase price – for the goodwill and Toledo Wire's customer list. In addition, Lockrey insisted that Toledo Wire

change its name. While this may have been a matter of transactional "housekeeping," as attorney McGowan claimed (Doc. 70 at 15), it also supports an inference that Lockrey did not want the name Toledo Wire associated with another existing (and perhaps competing) business in the area. That inference would seem to go hand-in-glove with the evidence that Lockrey solicited business from Toledo Wire customers.

This is but an abbreviated explication of the unpredictability of the result that I might come to by going beyond the paper record now before me, and on hearing the arguments of counsel. In these cases, moreover, the law requires, as part of my balancing, that "[t]he policy goals of the MPPAA – preventing increased financial burden on the remaining employers, disincentives to new employers, and fund insolvency – [ ] guide [me] in balancing the equities." *ManWeb*, *supra*, 884 F.3d 783. Here, however, the parties have offered little guidance on why those goals warrant balancing the equities in their favor.

For all these reasons, neither side is entitled to summary judgment on the issue whether Lockrey substantially continued Toledo Wire's business. I will therefore hold a bench trial to resolve the issue.

## B. Evasion of Withdrawal Liability

The MPPAA provides that "withdrawal liability is to be assessed without regard to any transaction entered into by the employer if a principal purpose of that transaction was to avoid or evade that liability." *Sherwin-Williams Co. v. NY State Teamsters Conf. Pension & Ret. Fund*, 158 F.3d 387, 392 (6th Cir. 1997) (citing 29 U.S.C. § 1392(c)).

"Under a plain language statutory reading th[is] provision applies when a contributing employer enters a transaction with a principal purpose of escaping its duty to pay withdrawal

liability to the plan or fund." *SUPERVALU, Inc. v. Bd. of Trustees of SW Pa. & W. Md. Area Teamsters & Employers Pension Fund*, 500 F.3d 334, 341 (3d Cir. 2007).

The case law establishes, moreover, that a pension plan "can recover" withdrawal liability "from parties that have received assets as a result of a liability-evading transaction[.]" *Einhorn v. Apex Equip. Co.*, 2014 WL 4209547, *8 (E.D. Pa. 2014); *see also IUE AFL-CIO Pension Fund v. Hermann*, 9 F.3d 1049, 1056 (2d Cir. 1993) (pension plan may recover transferred funds from non-employers, provided that the employer transferred funds intending to avoid liability); *Cent. States, SE & SW Areas Pension Fund v. Denny*, 250 F. Supp. 2d 948, 953 (N.D. Ill. 2003) ("In such cases, a plaintiff can reach those assets that were transferred in order to evade or avoid liability, as well as the parties to whom they were improperly transferred.") (internal quotation marks and alterations omitted).

In this case, it is undisputed that Ann and Ken used $21,000 of the sale proceeds and $24,000 from the sale of Toledo Wire's scrap for personal purposes, along with transferring to themselves title to two Toledo Wire vehicles. Finally, the Obertaczes admittedly used $50,000 of a loan secured by the Toledo Wire building[4] to construct a home for their own use. At the time of these shenanigans, moreover, it was undisputed that the Obertaczes had caused Toledo Wire to withdraw from the plan and to cease making withdrawal payments, and that they knew full well that the Plan had assessed Toledo Wire $644,311 in withdrawal liability.

This undisputed evidence makes manifest that a principal purpose of the pocketing of $97,500 and driving off in company cars was to avoid applying those assets to pay down partially the indebtedness to the Plan.

---

[4] When the building eventually sold, the proceeds went to satisfy the mortgage on the property.

This is so, despite the Obertaczes' denials that the transactions had no such purpose. (Docs. 84–1, 84–2). While the Obertaczes emphasize that they made substantial personal contributions to Toledo Wire to keep the business afloat, the majority of those contributions occurred in 2011 and 2012. Only after the imposition of withdrawal-liability and the asset sale did the Obertaczes begin taking money out of the company and using it for personal reasons.

Even viewed in the light most favorable to the Obertaczes, the undisputed evidence proves that a principal purpose of the transactions at issue was to evade or avoid the Obertaczes' substantial withdrawal liability. The Plan is therefore entitled to summary judgment on its claim under § 1392(c).

## Conclusion

It is, therefore,

ORDERED THAT:

1. The Plan's motion for summary judgment against Lockrey (Doc. 80) be, and the same hereby is, granted on the issue of notice and denied on the issue of substantial continuity.

2. Lockrey's motion for summary judgment against the Plan (Doc. 79) be, and the same hereby is, denied.

3. The Plan's motion for partial summary judgment against OBZ, Inc. (Doc. 81) on the withdrawal-liability claim be, and the same hereby is, granted; and

4. The Plan's motion for partial summary judgment against Ann Obertacz and Kenneth Obertacz (Doc. 81) on the claim under 29 U.S.C. § 1392(c) in the amount of $97,500, plus the fair market value as of the date of title transfer of the

Nissan Murano formerly belonging to Toledo Wire, be, and the same hereby is, granted.

5.      The following transactions are deemed null and void, and all proceeds shall be returned to OBZ, Inc. for immediate payment to the Plan:

    a.      The transfer of $45,000 in cash from Toledo Wire to the Obertaczes;

    b.      The distribution of $50,000 of proceeds to the Obertaczes from the loan secured by the Toledo Wire building;

    c.      The transfer of Toledo Wire's Dodge truck to the Obertaczes, which the Obertaczes later sold for $2,5000; and

    d.      The transfer of the Toledo Wire Nissan Murano to the Obertaczes.

6.      The Clerk of Court shall forthwith set this case for a telephonic status/scheduling conference.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge